Filed 8/13/14  In re L.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re L.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E060919 |
| Plaintiff and Respondent, | (Super.Ct.No. J246227-29) |
| v. | O P I N I O N |
| R.J., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Defendant and appellant, R.J. (Father), appeals orders terminating parental rights and placing his three children for adoption: L.P., a girl born in September 2012; I.P., a boy born in March 2011; and A.P., a boy born in June 2004.[1] Father claims the court erroneously refused to apply the sibling relationship exception to adoption. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(v).)[2] We affirm, because substantial evidence shows none of the children shared a significant bond with any of their older half siblings, and the court reasonably concluded adoption was the best option for the children.

# II. FACTS AND PROCEDURAL HISTORY

A. *Background*

The family came to the attention of plaintiff and respondent, San Bernardino County Children and Family Services (CFS), in September 2012 after L.P. and the mother tested positive for methamphetamine when L.P. was born. L.P. was transferred to the neonatal intensive care unit due to respiratory problems and withdrawals. The mother admitted using methamphetamine during the pregnancy, including the day before L.P. was born because she thought she was overdue and wanted to induce labor.

The parents were not married but had lived together for years. The mother was 31 years old and had been using methamphetamine since she was 13 years old. I.P. also

---

[1] The children's mother did not appeal.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

tested positive for methamphetamine when he was born in March 2011.[3] A.P. tested negative for drugs when he was born in June 2004, but the mother admitted that one year was the longest period she had been sober since junior high school.

Father was 41 years old and was reported to be "out of it" and "stumbling" at the hospital when L.P. was born. In addition to the three children he had with the mother, Father had five other children between the ages of 12 and 22 by three other mothers. Father reported having no contact with his older children and poor relationships with their mothers.

Each parent had several convictions for possessing and/or being under the influence of controlled substances. Father also had a 2005 conviction for inflicting corporal injury on a spouse/cohabitant and a 2008 burglary conviction. Father was on pain medication and collecting state disability payments because he was electrocuted while his "friend" was attempting to steal electrical components. Father did not take responsibility for his criminal history, claiming he "took the blame for someone else."

On October 2, 2012, the children were taken into protective custody and placed in foster care. The parents refused to participate in an inpatient treatment program and continued to use methamphetamine. In November 2012, the court sustained jurisdictional allegations based on the parents' drug use, their criminal histories, and the mother's related history of anxiety and depression. (§ 300, subds. (b), (j).) At

---

[3] The parents were offered services in April 2011, including outpatient treatment center referrals, but did not take advantage of them.

disposition, the children were ordered removed from parental custody (§ 361, subd. (c)), and the parents were offered reunification services and visitation.**4**

The children were placed with the paternal grandparents in November 2012, but were removed from that home in April 2013 after a driver found I.P. running across the street at an intersection near the home.  While the paternal grandmother was changing L.P.'s diaper and the paternal grandfather and an uncle were also in the home, none of them noticed I.P. had walked out of the "wide open" front door.**5**  In May 2013, the court sustained section 387 supplemental petitions and ordered the children removed, based on the paternal grandparents' failure to provide adequate care and supervision.**6**

The children were returned to foster care in April 2013, and in May the court granted CFS's request to "list" the children on Web sites seeking adoptive families for special needs children.  I.P. had language delays and hyperactivity, and required special

---

**4** The parents appealed the November 2012 dispositional orders, challenging the court's jurisdictional findings and order removing the children from their custody, and claiming inadequate notice was given under the Indian Child Welfare Act (ICWA) (25 U.S.C.A. § 1901 et seq.) and related California law (§§ 224.2, 224.3).  This court found the ICWA notices were inadequate and conditionally reversed the dispositional orders, but rejected the parents' other claims.  (*In re L.P.* (Oct. 29, 2013, E057864) [nonpub. opn.].)  On remand, CFS gave further ICWA notices.  The court found they were adequate and reinstated the dispositional orders.

**5** The paternal grandparents had delayed making medical appointments for the children and had delayed filling A.P.'s asthma and psoriasis medications.

**6** Both the mother and the paternal grandmother appealed the May 14, 2013, order removing the children from the paternal grandparents, and the appeal was assigned case No. E058648.  This court dismissed the paternal grandmother's appeal because she was not a party and dismissed the mother's appeal because it was abandoned.

care and supervision. In his evaluation, I.P. was described as a "very hyperactive, uncooperative, almost 'wild' child" with "piercing screams" and frequent tantrums. A.P. received poor to failing grades in third grade, was being assessed for attention deficit/hyperactivity disorder, and required a lot of support at home and at school. L.P. was being assessed for special needs.

The parents' services were terminated in June 2013. During a March 7 visit, the mother appeared to be under the influence, used profanity in front of the children, and was inappropriate with A.P., calling him names and telling him "you suck." A.P. was crying and the mother continued to yell at him. The social worker ended the visit, the mother called the social worker "a piece of shit," and security was called. The mother's visits were suspended on March 27, and were never reinstated.

Meanwhile, Father continued with his criminal lifestyle. In December 2012, he picked up another conviction for possessing a controlled substance and was placed on formal probation. In February 2013, when he was still on probation, Father was convicted of burglary and vandalism and sentenced to two years in prison. Father was released from custody early, in September 2013, and resumed supervised visits with the children. Father did not visit the children while incarcerated, but visits before and after his incarceration were consistent, and he was appropriate with the children.

B. *The Section 366.26 Hearing*

By October 2013, the children were in separate foster care homes and CFS had yet to locate an adoptive placement for all three of them. The children had been in multiple

5

foster placements since October 2012. Still, I.P. was making "great progress"; he was able to be redirected; he no longer cried excessively; and he was happy and affectionate. L.P. was being treated for developmental delays in gross motor skills, receptive language, and expressive language. She presented as "a happy child" who made good eye contact. A.P. was developmentally on target for his age and had an Individual Education Plan for a special learning disability. A.P. was friendly and articulate, affectionate toward his younger siblings, and engaged easily with adults. A.P. was receiving weekly therapy to address his feelings related to domestic violence between his parents.

In November 2013, CFS located an out-of-state, adoptive placement for all three children. I.P. and L.P. were still too young to understand adoption, but A.P. told the social worker he wanted an adoptive family "with a mom and dad, a Dalmation puppy, and his siblings." The adoptive parents had cared for many foster children and had adopted four special needs children. Their adopted children were born drug exposed and came to their home with aggressive behaviors and developmental delays which had since been resolved.

At the section 366.26 hearing on April 1, 2014, Father and his 19-year-old son Jacob testified. According to Father, Jacob regularly saw the children before they were detained in October 2012, and one of his older daughters, Alexandra, saw the children twice weekly. Thereafter, Jacob and Alexandra saw the children "a few times." They sometimes accompanied Father on his visits with the children, and they often visited the children in the paternal grandparents' home. Jacob and A.P. were "into video games."

6

Jacob testified he lived across the street from Father, the mother, and the children before October 2012, when the children were detained, and during that time he saw the children five days each week. He would "hang out" "all day" with A.P. and I.P., help A.P. with his homework, and play video and other games with the boys. When the children were placed with the paternal grandparents, Jacob visited them once or twice each week. After the children were returned to foster care, Jacob was able to visit them a few times by accompanying his Father on visits. He loved the children; they were his "blood," and he wanted to take them to sporting events and see them grow up.

At the conclusion of the hearing, the court terminated parental rights and selected adoption as the children's permanent plan. The court rejected Father's request to place the children in a guardianship based on the parental benefit exception to adoption, and each parent's request to apply the sibling relationship exception. The court indicated it was clearly in the best interests of the children to be adopted, and there was no compelling reason to apply either exception. Father's visits had not progressed beyond supervised, and the children's older half siblings had never lived with them. Father appealed.

## III. DISCUSSION

Father claims the court erroneously refused to apply the sibling relationship exception to the adoption preference. We find no error.

A.  *Applicable Law*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.)  Permanent plans include adoption, guardianship, and long-term foster care.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.)  "Adoption, where possible, is the permanent plan preferred by the Legislature."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal rights of the child's natural parents, but guardianship and long-term foster care leave parental rights intact.  (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.)  "'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'  [Citation.]"  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

"Adoption must be selected as the permanent plan for an adoptable child and parental rights terminated unless the court finds 'a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances:  [¶]  . . .  [¶]  (v)  There would be substantial interference with a child's sibling relationship . . . .'  (§ 366.26, subd. (c)(1)(B).)  '[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence.'  [Citation.]"  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

"The sibling relationship exception applies where the juvenile court finds that 'substantial interference with a child's sibling relationship' is a 'compelling reason' to conclude that adoption would be detrimental to the child.  In making this determination, the court should take into consideration 'the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.'  (§ 366.26, subd. (c)(1)(B)(v).)"  (*In re Bailey J., supra,* 189 Cal.App.4th at p. 1317.)

The mere existence of a sibling relationship is not enough to apply the exception; the relationship must be "sufficiently significant" to cause detriment upon its termination; otherwise, there is no "substantial interference" with the sibling relationship.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 ["Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended"].)

"Moreover, even if a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide."  (*In re L.Y.L., supra,* 101 Cal.App.4th. at pp. 952-953.)

B. *Standard of Review*

Appellate courts have traditionally applied either the substantial evidence test or the abuse of discretion test in considering challenges to juvenile court determinations of whether one or more of the statutory exceptions to adoption preference applies. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) There is little, if any, practical difference between the two. (*Ibid.*)

As explained in *In re Jasmine D.* (2000) 78 Cal.App.4th 1339: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did.' . . ."' [Citations.]" (*Id.* at p. 1351.)

More recently, courts have applied a composite standard of review, recognizing that the determination whether an adoption exception applies entails both factual and discretionary determinations. (*In re Bailey J., supra,* 189 Cal.App.4th at pp. 1314-1315 [substantial evidence standard applies to court's factual determination whether a beneficial relationship exists, and abuse of discretion standard applies to court's discretionary determination whether there is a compelling reason to apply the exception]; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re J.C.* (2014) 226 Cal.App.4th 503, 530-531.)

C. A*nalysis*

Father argues the children shared a close relationship with their older half siblings, including 19-year-old Jacob, and the loss of those sibling relationships was a compelling reason not to place the children for adoption and terminate Father's parental rights. Father's claim is unavailing because substantial evidence shows the children did not share a significant bond or relationship with any of their older half siblings, and the court reasonably concluded the children would benefit more from being adopted than from being deprived of a permanent, adoptive home for the sake of continuing their insignificant relationships with their older half siblings.

As the court acknowledged, the children had never lived with their older half siblings; they shared no significant common experiences; and they shared no close or strong bonds. (§ 366.26, subd. (c)(1)(B)(v).)  I.P. and L.P. were toddlers and barely knew any of their older half siblings.  Even A.P., who was eight years old when detained, did not share a significant emotional attachment to Jacob, even though Jacob used to "hang out" with him, help him with his homework, and play video games with him.  A.P. was close to I.P. and L.P., and told the social worker he wanted to be adopted.  In sum, the court reasonably determined there was no compelling reason to apply the sibling relationship exception.

Father argues *Jacob* shared a significant relationship with the children and suggests severing that relationship would be detrimental to *Jacob*, but that is not a reason to apply the exception.  Though a sibling's relationship with an adoptive child "might be

11

relevant as indirect evidence of the effect the adoption may have on the adoptive child. . . . [T]he ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*In re Celine R., supra,* 31 Cal.4th at p. 55.) And here, the court reasonably concluded that severing the children's relationships with their older half siblings would not be detrimental to them. (*In re D.M.* (2012) 205 Cal.App.4th 283, 293 [substantial evidence supported court's determination that terminating sibling relationship would not be sufficiently detrimental to adoptive children to preclude termination of parental rights]; *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [same]; cf. *In re Naomi P.* (2005) 132 Cal.App.4th 808, 811, 824 [on appeal by social services agency, substantial evidence supported court's determination that sibling relationship exception *did apply*].)

## IV.  DISPOSITION

The April 1, 2014, orders terminating parental rights and placing the children for adoption are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.

12